1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| JOEANN COLEMAN, | ) | 1:08-cv-01694-JLT |
| | ) | |
| | ) | DECISION AND ORDER ON SOCIAL |
| | ) | SECURITY COMPLAINT (DOC. 1) |
| Plaintiff, | ) | |
| | ) | ORDER DIRECTING REMAND PURSUANT |
| v. | ) | TO SENTENCE FOUR of 42 U.S.C. § 405(g) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | ORDER DIRECTING THE CLERK TO ENTER |
| COMMISSIONER OF SOCIAL | ) | JUDGMENT FOR PLAINTIFF JOEANN |
| SECURITY, | ) | COLEMAN AND AGAINST DEFENDANT |
| | ) | MICHAEL J. ASTRUE |
| Defendant. | ) | |
| | ) | |

Plaintiff Joeann Coleman ("Plaintiff") seeks judicial review of an administrative decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). Pending before the Court is Plaintiff's appeal from the administrative decision of the Commissioner of Social Security ("Commissioner"). The decision under review is that of Social Security Administration (SSA) Administrative Law Judge (ALJ) Bert C. Hoffman, Jr., dated July 17, 2008 (A.R. 13-21), issued after a hearing held on May 13, 2008. (A.R. 13, 34-83).[1]

On November 13, 2008, Plaintiff's complaint was filed in the United States District Court for the Eastern District of California. (Doc. 2). Plaintiff filed her opening brief on July 2, 2009.

---

[1] Plaintiff had filed a previous claim for DIB, which had been denied on October 13, 2006, after a hearing. (A.R. 124.)

1    (Doc. 16).  The Commissioner filed his opposition brief on September 2, 2009.  (Doc. 18).

2    Plaintiff filed a reply brief on September 17, 2009.  (Doc. 19).  The matter has been submitted

3    without oral argument to the Magistrate Judge.

4         I. Jurisdiction

5         Plaintiff timely filed her complaint on November 3, 2008. This Court has subject matter

6    jurisdiction pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).

7         II. Standard and Scope of Review

8         Congress has provided a limited scope of judicial review of the Commissioner's decision

9    to deny benefits under the Act. In reviewing findings of fact with respect to such determinations,

10   the Court must determine whether the decision of the Commissioner is supported by substantial

11   evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla,"

12   Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v.

13   Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a

14   reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401.

15   The Court must consider the record as a whole, weighing both the evidence that supports and the

16   evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of

17   evidence that supports the decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.

18   2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  It is immaterial that the evidence

19   would support a finding contrary to that reached by the Commissioner; the determination of the

20   Commissioner as to a factual matter will stand if supported by substantial evidence because it is

21   the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. Sorenson v.

22   Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

23        In weighing the evidence and making findings, the Commissioner must apply the proper

24   legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review

25   the whole record and uphold the Commissioner's determination that the claimant is not disabled if

26   the Commissioner applied the proper legal standards, and if the Commissioner's findings are

27   supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812

28   F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the

2

1   ALJ did not use the proper legal standard, the matter will be remanded to permit application of the

2   appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

3       III. Disability

4           A. Legal Standards

5       In order to qualify for benefits, a claimant must establish that she is unable to engage in

6   substantial gainful activity due to a medically determinable physical or mental impairment which

7   has lasted or can be expected to last for a continuous period of not less than twelve months. 42

8   U.S.C. §§ 416(i), 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment

9   of such severity that the claimant is not only unable to do the claimant's previous work, but

10  cannot, considering age, education, and work experience, engage in any other kind of substantial

11  gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v.

12  Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on

13  the claimant, who must prove that the claimant is unable to return to her former type of work; the

14  burden then shifts to the Commissioner to identify other jobs that the claimant is capable of

15  performing considering the claimant's residual functional capacity, as well as her age, education

16  and last fifteen years of work experience. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

17      The regulations provide that the ALJ must make specific sequential determinations in the

18  process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity

19  since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520;[2] 2) whether solely on

20  the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude

21  sufficient to limit significantly the individual's physical or mental ability to do basic work

22  activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the

23  impairment equals or exceeds in severity certain impairments described in Appendix I of the

24  regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional

25  capacity, defined as what an individual can still do despite limitations, to perform the applicant's

26  past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's

27

28

_____

[2] All references are to the 2008 version of the Code of Federal Regulations unless otherwise noted.

age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

With respect to SSI, the five-step evaluation process is essentially the same. See 20 C.F.R. § 416.920.

## B. The ALJ's Findings

The ALJ concluded that although there had been an earlier, unfavorable decision dated October 13, 2006, Plaintiff had presented new and material evidence warranting a change in her residual functional capacity (RFC). As a result, the presumption of continuing non-disability that would otherwise apply[3] was not applicable, although the earlier decision was res judicata as to the period through the date of decision. Thus, the ALJ considered the period beginning October 14, 2006. (A.R. 13l.)

The ALJ found that Plaintiff had severe impairments of right knee internal derangement, back pain, degenerative joint disease, headaches, depression, and moderate obesity.  However, the ALJ determined that Plaintiff had no impairment or combination of impairments that met or medically equaled a listed impairment. (A.R. 15-16.) Plaintiff retained the RFC to lift and carry twenty pounds occasionally and ten pounds frequently, to stand and walk two hours and sit six hours in an eight-hour workday, and to perform simple, repetitive tasks with limited contact with coworkers. (A.R. 17.) Plaintiff could not perform her past relevant work as an IHSS care provider, but considering Plaintiff's age (forty-four years old at the time of the alleged onset of disability), her limited education, and her ability to communicate in English, the ALJ concluded that Plaintiff's exertional and non-exertional limitations had little or no effect on the occupational base of unskilled sedentary work.  Therefore, the ALJ found that she had not been under a disability from October 14, 2006 through July 17, 2008, the date of decision. (A.R. 20-21.)

## C. Plaintiff's Contentions

Plaintiff argues that with respect to Plaintiff's RFC that, 1) the ALJ failed to state reasons

---

[3] Because Plaintiff was found not to be disabled in the prior decision of the ALJ, there was a continuing presumption of non-disability that Plaintiff had to overcome by proving changed circumstances that indicated a greater disability. Chavez v. Bowen, 844 F.2d 691, 693-94 (9th Cir. 1988).

1  for apparently rejecting limitations assessed by consulting examining psychologist Dr. Greg

2  Hirokawa although the ALJ relied upon this opinion significantly, and 2) the record did not

3  contain substantial evidence to support the physical RFC. Further, in light of her multiple

4  limitations that could have affected the unskilled sedentary occupational base, including but not

5  limited to a need to use a cane to ambulate, Plaintiff contends that the ALJ erred at step five by

6  failing to obtain necessary vocational expert testimony to permit an informed assessment of the

7  occupational base.

8      IV. <u>The Medical Evidence</u>

9      In the portion of Plaintiff's opening brief relating to medical evidence, Plaintiff states the

10 following:

11         Joeann Coleman does not dispute the ALJ's finding of a sedentary residual
           functional capacity prior to September 2007. Coleman disputes the ALJ's failure to
12         find that Coleman required the use of a cane after her injury of September 2007.
           Coleman also disputes the ALJ's finding regarding the severity of Coleman's
13         mental impairment throughout the time period. The relevant mental medical
           evidence is Dr. Hirokawa's consultative examination opinion and the treatment
14         records from Fresno Mental Health as we have no distinct treating opinion. (A.R.
           229-234, 277-350). The relevant exertional medical evidence includes records and
15         prescriptions for Coleman's cane after September 2007. (A.R. 353-373).

16 (Opening Brief p. 3, ll. 13-21.)  In his brief, Defendant Commissioner states,

17         Other than the evidence concerning her knee injury and use of a cane, the evidence
           of Plaintiff's physical impairments is not relevant because Plaintiff does not
18         challenge the ALJ's determination regarding her physical impairments. In fact,
           Plaintiff concedes that the physical residual functional capacity assessed by the
19         ALJ was reasonable except for Plaintiff's post September of 2007 knee problems
           and her use of a cane. Plaintiff's Brief at 12.
20

21 (Deft.'s Brief p. 3, n. 1.) Therefore, with respect to Plaintiff's exertional or physical RFC, the

22 Court will summarize the evidence concerning her knee problems beginning in September 2007

23 as well as any evidence concerning Plaintiff's use of a cane. With respect to Plaintiff's mental

24 impairment, Dr. Hirokawa's report and all pertinent treatment notes will be summarized.[4]

25 _____

26     [4] In the decision, the ALJ summarized Plaintiff's history of conservative treatment, including right knee
    injections, physical therapy, pain medication, and inflammatory medication for back pain, and Imitrex for headaches.
27 (A.R. 18-20.) The ALJ noted the comprehensive internal medicine evaluation of Plaintiff by Dr. Adi Klein in
    February 2007, which revealed an essentially normal physical exam with the exception of mild swelling, bony
28 deformity, and crepitus of the right knee and slow and mildly antalgic gain on the right, and resulted in Dr. Klein's
    assessment of right knee internal derangement by exam and history, back pain, degenerative joint disease by history

Treatment records from University Medical Center (UMC) for the period from May 26, 2006 through June 7, 2007, reflect that Plaintiff received treatment in the form of physical therapy and medications (Vicodin, Naproxen, Atenolol, Metoprolol, Tramadol, Elavil, and steroid injection)[5] for depression, back and knee pain and swelling, kidney stone, headache, and hypertension. (A.R. 241-50.)

On February 12, 2007, Greg Hirokawa, Ph.D., reviewed medical reports and a marriage family therapist's progress note that opined that Plaintiff had major depressive disorder, recurrent with psychotic features. Dr. Hirokawa then performed a comprehensive psychiatric evaluation of Plaintiff, who was forty-four years old. (A.R. 229-34.) Plaintiff was punctual and  cooperative. She was oriented in all three spheres and exhibited fair hygiene, posture, and eye-contact.  She exhibited appropriate facial expressions, had a pleasant attitude but a depressed mood and although she showed an appropriate affect, she was tearful at times.  She had normal psychomotor functioning, stream of mental activity and association of thought.  Her speech was characterized by clear articulation, normal velocity and volume, and appropriate quantity. Her intellectual functioning appeared to be within the below-average range and her recent and remote memory appeared to be intact. She was able to perform a simple, three-step command but could not spell the word "world" backwards. She could perform a simple, two-digit sum but could not accurately perform a multiplication problem. There was no evidence of vocal or motor ticks, delusional thinking or response to internal stimuli.  Her contact with reality contact appeared to be intact. She gave fair effort and completed a questionnaire concerning her psycho-social history.

Plaintiff reported feeling depressed and anxious and she reported hearing voices now and

and records, headaches and depression by history, and moderate obesity by exam, with an RFC of lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking two hours, and sitting six hours in an eight-hour workday. (A.R. 19, 235-39.) The ALJ noted that in March 2007, x-rays of the right knee showed moderate, degenerative changes manifested by loss of joint space medially; no acute abnormalities were visible. (A.R. 18, 240.) The ALJ also summarized the opinion of state agency medical consultants that Plaintiff had the RFC to lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand and walk two hours, and sit six hours, with only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (A.R. 19.) The ALJ gave no weight to the opinion of treating source Dr. Nicholas Orme that Plaintiff could not perform any work, but gave "[m]ore weight" to the consultative evaluators Dr. Klein and Dr. Hirokawa as examining sources. (A.R. 20.)

[5] Not all names of medications are legible. (A. R. 244-46, 250.)

then telling her to hurt herself.  She reported that she saw shadows. She reported that it was difficult to sleep and be around others; that she had mood swings, memory problems, withdrawal, anger, confusion, fair appetite, and stress. She said she had a long history of anger, depression, and problems getting along with people, with depression worsening for two years because of physical problems (right knee problems, arthritis in the lower back, migraines, diabetes, and high blood pressure), pain, financial issues, and being unable to work. She denied suicidal ideation. She reported that she had been in a psychiatric hospital once in 1994 for depression but had first received mental health treatment during the eight months preceding the hearing. She had completed the eleventh grade with below-average performance in special education classes and a history of fights and conduct problems. Plaintiff reported that she could drive and looked for a job every day.

Plaintiff cooked, did laundry, and swept.  However, she relied on her daughter to drive her around, take her out and to help her pay her bills. She reported that she stopped working in April 2006 due to health problems. The longest job she held was performing in-home services for two years, although she had also worked at a packing company, farms, and provided childcare. She had been fired for getting into a fight.  She reported that her problems at work were due to getting into fights and arguments with other co-workers. She reported that she was once arrested for assault.

On axis I, Dr. Hirokawa's diagnosis was depressive disorder, not otherwise specified and anxiety disorder, not otherwise specified.  On axis II, he diagnosed personality disorder, not otherwise specified, rule out low average intellectual functioning.  Also, he determined that Plaintiff's global assessment of functioning (GAF) was 61. (A.R. 232.)  The doctor opined that Plaintiff's symptoms of depression and anxiety were within the mild range and primarily due to her physical problems and associated limitations; her reported hallucinations did not appear to reflect a formal thought disorder. Although her intellectual functioning appeared to be at a low-average level, her communication skills and response to treatment for depression, were fair. The likelihood of her mental condition's improving within the next twelve months was fair. She appeared to have a personality disorder consisting of poor interpersonal skills, anger problems,

1   sensitivity to criticism, and misinterpreting others. (A.R. 233.)

2        Dr. Hirokawa opined that with respect to her psychiatric condition only, Plaintiff was

3   mildly limited in her ability to remember location and work-like procedures, understand and

4   remember very short, simple and detailed instructions, and to carry out very short, simple

5   instructions; maintain attention and concentration for extended periods; perform activities within

6   a schedule, maintain regular attendance, and be punctual; and sustain an ordinary routine without

7   special supervision. Her social judgment and awareness of socially appropriate behavior was also

8   mildly limited. (A.R. 233-34.) Plaintiff was mildly to moderately limited in her ability to complete

9   a normal workday and workweek without interruptions from psychologically based symptoms,

10  perform at a consistent pace, withstand the stress of a routine workday, and deal with various

11  changes in the work setting. (Id.) Plaintiff was moderately limited in her ability to accept

12  instructions from a supervisor, respond appropriately to criticism and interact with coworkers due

13  to her personality disorder. (Id.) The likelihood that she would emotionally deteriorate in a work

14  environment was mild to moderate. (A.R. 234.)

15       On April 4, 2007, Dr. Harvey Biala, a state agency medical consultant, completed a

16  psychiatric review technique concerning Plaintiff's affective, anxiety-related and personality

17  disorders. (A.R. 263-73, 263.) He opined that Plaintiff's depressive disorder not otherwise

18  specified, anxiety disorder not otherwise specified and personality disorder not otherwise

19  specified, resulted in mild restriction of activities of daily living and difficulties in maintaining

20  social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no

21  episodes of decompensation, with respect to the "B" criteria of the listings. (A.R. 271.) The

22  evidence did not establish the presence of the "C" criteria. (A.R. 272.)

23       Dr. Biala further opined that Plaintiff was not significantly limited in the ability to

24  remember locations and work-like procedures; to understand, remember, and carry out very short

25  and simple instructions; to maintain attention and concentration for extended periods; to perform

26  activities within a schedule; to maintain regular attendance; be punctual within customary

27  tolerances; to sustain an ordinary routine without special supervision; to work in coordination

28  with or proximity to others without being distracted by them; to complete a normal workday and

week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (A.R. 274-75.) Dr. Biala opined that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions. (A.R. 274.) Dr. Biala elaborated on his opinion by stating that Plaintiff was cognitively intact for simple tasks; her concentration, persistence, and pace ("CPP") was sufficient for two-hour intervals and an ordinary work week; she was socially available for superficial relatedness; and she could adapt. (A.R. 276.)

Records of Plaintiff's treatment for her mental condition at the Fresno County Human Services Department of Behavioral Health cover the period from July 11, 2006 through October 11, 2007, in connection with a diagnosis of major depressive disorder, severe, with psychotic features. (A.R. 277-350, 349-50.) Plaintiff attended group therapy once or twice a week in the summer of 2006. (A.R. 349-50, 336.) Rich Eidenschink, L.M.F.T., noted in July 2006 that Plaintiff's relating to other group members improved; she made good progress in managing her depression, was calmer, and was able to listen to other group members without getting irritable; she made no mention of psychotic symptoms; she reported that her sleep had improved to three good nights of sleep a week, she had cut down on her caffeine and did not drink it after six p.m., her appetite had improved slightly, she spent less time being irritable and upset with others, and she was learning to set better boundaries with people close to her in her life. (A.R. 348-49.) In mid-July 2006, Plaintiff reported that she felt better about having demanded that her son and his girlfriend take care of their children instead of her having to do it; she was handling her anger better, feeling less depressed and irritable, laughing and smiling more, and was more tolerant of others. She reported that her medications were controlling her psychotic symptoms, which were

absent; her sleep continued to improve to up to seven hours a night, four nights a week. Although irritability and negativity with others continued, Plaintiff reported the frequency had decreased from almost every day to only two or three days a week. (A.R. 343-45.)

By August 2006, Plaintiff reported increasing success with setting boundaries, ceasing enabling behavior, and maintaining patience during a judicial proceeding and in her relationship with her apartment manager when rent was overdue. Therapist Eidenschink noted that Plaintiff was dealing with her tendency to isolate by coming to group, and she was learning coping skills. Her depression was decreasing. (A.R. 337-41.) She reported ending an estrangement with a daughter that had lasted for over two years; her sleep was poor, but she was counseled on appropriate sleep routines. (A.R. 336.) She was not bothered by psychotic symptoms, and she was learning to express herself well. (A.R. 333-35.)

In September 2006, Plaintiff reported to group therapy that she got six months' probation on a charge involving violence to another.  However, the therapist noted that she was managing her anger and her depression better. (A.R. 333.) She reported having shared the Labor Day holiday with relatives, and her oldest daughter reported that Plaintiff had changed for the good due to going to group therapy sessions and that she was not as mean as before. Her therapist noted that she was swearing and yelling less as she continued to learn new skills for dealing with incompetency and the complications of bureaucracy. (A.R. 332.) Plaintiff reported being relieved when she receiving reimbursement of some funds which allowed her to pay overdue bills.  She reported that her inability to pay bills timely caused her a lot of worry. (A.R. 330.) She was able to handle appropriately an issue concerning a person who collided with her car in a parking lot. (A.R. 329.)

In October 2006, Plaintiff reported that her life was going really smoothly then.  She reported that when she needed help figuring something out, she could talk about it in group therapy. (A.R. 325.)  Increased calmness and fewer angry outbursts and swearing spells were noted. (A.R. 324.) Although Plaintiff was angry at her therapist for cutting her off in group therapy, she was making progress in controlling her angry outbursts.  For example, although she had been upset with the therapist, she had not used profanity when talking to him. (A.R. 323.) She

1   exhibited new coping skills by asking to speak to her group facilitator's supervisor, participating

2   in meetings with appropriate staff, and communicating with her group about what she perceived

3   as being cut off and being harassed by the therapist concerning her use of profanity and a loud

4   voice. (A.R. 321-22.) It was noted that this incident reflected her overall, significant progress.

5   After this incident, ground rules were agreed upon concerning what was appropriate process and

6   behavior in group therapy. It was agreed that she could use profanity and that other group

7   members would be able to register any reaction to it. (A.R. 320, 317-18.) Plaintiff reported that

8   she heard voices but mostly just when she was alone.  She reported that sometimes her mother

9   appeared in her dreams and communicated with her. Plaintiff reported she looked for things to do

10  outside of the house so she did not sleep too much. (A.R. 314.) While attending a session

11  designed to give SSI/SSD information, she was patient, practiced good listening skills, asked

12  some good questions, and did some swearing, which was her way of talking when she was

13  comfortable in a social situation. (A.R. 312.)

14          In November 2006, Plaintiff reported poor sleep due to noncompliance with her

15  medication, which made her too drowsy to run all her errands. (A.R. 311.) In December, she was

16  angry when she was told she had to stop sharing her story with the group in order to allow others

17  to speak.  Also, she continued to use profanity. (A.R. 307.) She was rude to a group member but

18  apologized later. (A.R. 307.)  Due to a personality conflict between Plaintiff and therapist

19  Eidenschink, another therapist agreed to take the lead role in dealing with Plaintiff in the future.

20  Also, other groups were considered as an alternative treatment placement for Plaintiff. (A.R. 306.)

21  Plaintiff continued to work on her anger and her tendency to "go off" on people, especially men

22  and authority figures. Her good progress, including decreased swearing, was noted. (A.R. 305.)

23          In 2007, Plaintiff reported that she had been hit by a ceiling fan in her apartment that fell

24  on her while it was being repaired.  She reported that the fan fell on her knee and head. As a result

25  of her injuries, she was hospitalized and was attempting to find a lawyer to help her get some

26  money from the apartment complex. (A.R. 302, 300.) In early 2007, Plaintiff was repeatedly

27  described in the mental health progress notes as attentive, supportive, bright, and smiling. (A.R.

28  304, 303, 301, 300, 299, 298.) She continued to work on issues concerning domestic violence she

1  had experienced earlier in her life when married in Arkansas.  The therapist noted that recently

2  she had been angered by a man who stepped on her toes on two separate occasions in a store, and

3  although she swore at him and told him how rude he was, she refrained from getting physical.

4  (A.R. 296.) In late February, she celebrated a birthday happily but was stressed because police had

5  been called to the home of her grandchildren, who alleged their mother had hit them.  As a result,

6  she anticipated that court proceedings would be initiated. The therapist noted that despite her

7  stress and her talking as if she were going to become physical with people, she was able to vent

8  and make more rational decisions. She heard voices only three times a week instead of every day

9  and her psychotic symptoms were controlled by the medication. (A.R. 293-94.)

10      By early March 2007, therapist Eidenschink noted that he was retiring.  He noted also that

11  Plaintiff could no longer get psychiatric medications from her primary care physician but was

12  given a medication evaluation appointment with a doctor in the first week of April. (A.R. 292.)

13  On March 12, 2007, Plaintiff reported that she had argued with her intoxicated boyfriend and

14  became "physical" with him.  During the incident, he called the police and Plaintiff was taken to

15  jail and charged with assault.  Because she had just completed probation on assault charges, she

16  anticipated being placed back on probation. (A.R. 290.) In late March, Plaintiff had poor sleep.

17  (A.R. 288.) In March, April, and May Plaintiff repeatedly appeared at group therapy smiling and

18  with bright affect. (A.R. 291, 289, 288, 284, 283.)

19      In early April 2007, at a medication appointment, Plaintiff reported to Dr. Petros Ghermay

20  that because her youngest son had turned twenty-one, she lost her medical insurance the previous

21  month. (A.R. 285-87.) She reported constant depression and isolation, stress, problems with anger

22  and fighting, fear of others being angry with her, and fear of her husband coming to beat her. She

23  had insomnia, nightmares, feelings of worthlessness, and reduced concentration for the last three

24  months. She denied homicidal or suicidal ideation. She heard noises and mumbling voices, and

25  she saw shadows mostly when she did not go out and was in the apartment alone a lot. She

26  reported hospitalization in Arkansas in the 1980's for a total breakdown and her only suicide

27  attempt. She reported taking three Vicodin at night for pain. She exhibited good grooming and

28  hygiene, fair eye contact, irritable mood, and highly restricted affect.

Dr. Ghermay's diagnosed Plaintiff, on axis I, with major depressive disorder, recurrent, with psychotic features, probable diagnosis of P.T.S.D. and probable diagnosis of alcohol abuse in remission.  As to axis II, Dr. Ghermay diagnosis was deferred on axis II.  However, he noted a GAF score as 45 to 50. (A.R. 287.) The plan was to prescribe Prozac and see that her medical care was resumed. (Id.)

In May 2007, Plaintiff reported at therapy that everything had been going OK with her. She reported that she was dealing with an outage of the outside lights at her apartment complex in an appropriate manner. (A.R. 284.) In June, she related that she understood that her anger was internal and was her responsibility to manage, and she reported having spent some quality time with her daughter. (A.R. 282.) She had been doing pretty well with medication, which was calming her down, allowing more rest, and reducing her anger, frustration, and depression. She had done more than she usually did because she was more social and less isolative since beginning Prozac. (A.R. 281.) She was well groomed and cooperative, with normal motor activity, alert sensorium, average intelligence, improved insight and judgment, and normal cognition, speech, and orientation. She had organized thought processes, broader affect, and an ability to smile. She reported reduced fearfulness of others, anger, and isolation despite still hearing noises. Her mood was depressed half of the time. (A.R. 281.)

At the time, Dr. Ghermay's diagnosis on axis I was major depressive disorder, recurrent, rule out with psychotic features and a GAF score 45 to 50. (A.R. 281.) Dr. Ghermay planned to increase the Prozac dose to target depression after her early positive response and he proposed a plan of medication and periodic meetings to monitor Plaintiff's medication. (A.R. 280-81.)

Plaintiff continued with group therapy in June 2007, where it was noted that she was coping well with current stressors, including an upcoming court date and intrusive neighbors. Notes indicated that she had no psychotic symptoms. (A.R. 279.)

Records from Community Medical Center (CMC) reflect that on September 18, 2007, Plaintiff reported that she was present to get a disability form signed and to get a refill of her Vicodin. She reported that the previous week her right knee gave way, and she fell. She rated her back and knee pain at a level of 7/10.  Her right knee was swollen, warm to the touch and mildly

1  tender to palpation along the medial side. (A.R. 371.) The practitioner, Humaira Sadiq, assessed

2  Plaintiff's right knee pain, agreed to refill the Vicodin prescription and planned to do a joint

3  aspiration in the future.[6] (A.R. 372.) On September 27, 2007, Plaintiff reported that she was out of

4  medication. The treatment noted showed that the x-ray taken on January 3, 2007 of the right knee

5  had been negative.  On examination, Plaintiff exhibited no edema but a mildly swollen right knee

6  that was tender to palpation. (A.R. 369.) Synovial fluid was to be sent for analysis to determine if

7  the right knee pain was arthritic, traumatic, or due to gout, but the amount of fluid was minimal.

8  Plaintiff was provided a renewed prescription for Vicodin due to her back pain and a MRI was

9  planned. (A.R. 369-70.)

10      On November 29, 2007, Plaintiff sought refills of medications and complained of lower

11  back pain at a level of 9/10. (A.R. 365-66.)  A MRI showed a torn anterior cruciate ligament, a

12  tear on the medial meniscus, joint effusion, and a Baker cyst. The plan was an orthopedic

13  consultation and continued pain medication. Plaintiff was advised to avoid weight bearing on the

14  right side. At the end of the signed progress note, there was an "Attending Note," in different

15  handwriting, that stated that the patient was evaluated with the resident and needed an orthopedic

16  consult ASAP for the anterior cruciate ligament tear. Plaintiff was advised to avoid bearing

17  weight and to use a cane instead. This separate note was signed by Belayneh Abejie, who was

18  identified on test reports of University Medical Center as a physician treating Plaintiff. (A.R. 366,

19  364.)

20      On March 13, 2008, Plaintiff returned to CMC for follow-up for her knee and help in

21  applying for permanent disability.  At the time, the orthopedic consultation was still pending.

22  Plaintiff had no edema and her right knee was mildly swollen and tender to palpation on the

23  medial side. (A.R. 353.) The plan was to continue with pain medication, and Dr. Abejie signed an

24  "Attending" note that he had evaluated Plaintiff with the resident, and had reviewed and discussed

25  the plan. (A.R. 354.) Plaintiff was very upset that the practitioner would not sign her disability

26  form. Instead, it appears that the doctor advised her that she needed temporary disability. Plaintiff

27

28      [6] The capacity of the practitioner was unclear. It appears from CMC outpatient registration records that Plaintiff's "unregistered M.D."  was Humaira Sadiq. (A.R. 367.)

1  reported that she had difficulty ambulating because of the pain. The practitioner stated that
2  Plaintiff was temporarily disabled for three months because of her current problem with her knee
3  joint. (A.R. 354.)

4          Plaintiff's undated list of medications[7] included Amitriptyline for sleep, Imitrex for
5  migraines, medications for high blood pressure, Hydrocodone every six hours as needed and
6  Tramadol every eight hours for pain, and water pills. (A.R. 175.)

7          V. Plaintiff's Testimony

8          Plaintiff, who was 47 years old at the time of the hearing, testified about her use of a cane.
9  She testified that her right knee went out and she could not walk and that she walked with the
10  cane on the right side all the time. She reported that she had to use the cane and that if she did not,
11  her right knee gave out a lot, such as when she had been standing for about fifteen or twenty
12  minutes, and when she was walking. She reported that she had and the last fall was in 2007. (A.R.
13  40, 57-58, 60.)  Plaintiff reported that Dr. Sadiq prescribed the cane in March 2008. (A.R. 59.)
14  She stated that surgery was supposed to have been done during the month before the hearing but
15  that the surgeon could not take Plaintiff's insurance (MISP) and that she needed a Medicaid card.
16  (A.R. 60.)

17          The remainder of Plaintiff's testimony is not summarized because Plaintiff does not
18  challenge the ALJ's findings concerning her credibility. The ALJ detailed Plaintiff's testimony that
19  she could not work because of back pain, a right knee that swelled and gave out so that she could
20  not walk without falling unless she used a cane, pain and loss of balance when she bent over,
21  inability to reach overhead or use her arm repetitively, migraine headaches occurring three times a
22  week and lasting an hour and one-half until Imitrex took effect, hand cramps, painful left leg,
23  bladder frequency, depression and anxiety, isolation, voices audible every week or so, and
24  drowsiness from pain medication. (A.R. 17.)

25          The ALJ found, however, that although Plaintiff's mentally determinable impairments
26  could reasonably have been expected to produce the alleged symptoms, her statements concerning

27

28          _____
                [7] The form is marked received by the Office of Hearings and Appeals in Fresno on April 4, 2008.

the intensity, persistence, and limiting effects of her symptoms were not credible to the extent inconsistent with the ALJ's RFC. (A.R. 18.) In so finding, the ALJ relied on her ability to do a wide range of activities of daily living that included having a driver's license and driving, doing dishes and cleaning her apartment, helping a neighbor with shopping and cleaning his apartment, helping her daughter with chores and shopping, running lots of errands during the day, doing her own banking, seeing her grandchildren and sometimes hosting and taking care of them, going fishing, dressing nicely with nicely styled hair, renting movies and staying up all night to watch them, and enjoying celebrating her birthday and the Labor Day holiday. (A.R. 18, 16.)

The ALJ also relied on the nature of the treatment given to Plaintiff. (A.R. 18.) He reviewed the x-rays of L4 and L5 that showed moderate degenerative changes and slight spondylolisthesis, the studies of the right knee from March 2007 that showed moderate degenerative changes manifested by loss of joint space medially, and the MRI of the knee from March 2008 that reflected an anterior cruciate ligament tear of the medial meniscus and Baker cyst that was pending surgery. (A.R. 18.) He reasoned that for her headaches and knee and back pain, the treatment reflected in the medical evidence was conservative, consisting of right knee injections, physical therapy, pain medication, inflammatory medication for back pain, and Imitrex for headaches. (A.R. 18.)

Further, Plaintiff's medication list indicated that although she took Amitriptyline for her insomnia, she was not on any anti-depressant medication.  Also, records from her therapy revealed that Plaintiff was learning to control her anger and her psychotic symptoms were controlled by medication. (A.R. 18-19.)

The ALJ also relied on the inconsistency of the expert opinions with Plaintiff's complaints. The RFC assessments of consulting, internal medicine examiner Dr. Adi Klein (light exertional work with standing and walking limited to two hours per workday) and consulting psychiatric examiner Dr. Hirokawa (GAF of 61) were detailed. The ALJ noted the mild and moderate limitations assessed by Dr. Hirokawa but he interpreted the evidence by noting the doctor's rating of Plaintiff's depression and anxiety as mild and by reasoning that the significance of the doctor's GAF assessment according to the Diagnostic and Statistical Manual of Mental

1  Disorders was "some mild limitations (e.g. depressed mood and mild insomnia) or some difficulty

2  in social, occupational, or school functioning." (A.R. 19.)

3       Because Plaintiff does not raise any arguments concerning these findings, the Court

4  applies the established principle of review that issues not specifically and distinctly raised and

5  argued in the opening brief are generally not considered. International Union of Bricklayers and

6  Allied Craftsmen, etc. v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir. 1985). Accordingly, no

7  detailed summary of the evidence pertinent to he credibility findings is required.

8       VI. Opinion of Consulting, Examining Psychologist, Dr. Hirokawa

9       Plaintiff challenges the ALJ's failure to explain his apparent rejection of portions of the

10 opinion of Dr. Hirokawa.

11          A. Background

12       The ALJ acknowledged Dr. Hirokawa's assessment of moderate limitations in the ability

13 not only to interact with coworkers, but also to accept instruction from a supervisor and respond

14 appropriately to criticism. (A.R. 19, 20.) The ALJ expressly accorded greater weight to Dr.

15 Hirokawa's opinion concerning Plaintiff's ability to perform work than to the opinion of

16 Plaintiff's treating physician, Dr. Orme, which was to the effect that Plaintiff could not perform

17 any work. (A.R. 20.) The ALJ included Dr. Hirokawa's limitations concerning simple, repetitive

18 tasks and co-workers in the RFC, concluding that Plaintiff had the ability to perform simple and

19 repetitive tasks with limited contact with coworkers. (A.R. 1.7) However, the ALJ did not explain

20 why other limitations assessed by Dr. Hirokawa were not adopted.

21          B. Legal Standards concerning Expert Opinions

22       An ALJ may disregard a treating physician's opinion that is controverted by other opinions

23 only by setting forth specific, legitimate reasons for doing so that are based on substantial

24 evidence in the record. Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989). This burden is met

25 by stating a detailed and thorough summary of the facts and conflicting clinical evidence, stating

26 the interpretation of the evidence, and making findings. Cotton v. Bowen, 799 F.2d 1403, 1408

27 (9th Cir 1986). However, if the medical opinion of a claimant's treating physician is

28 uncontroverted, then an ALJ must present clear and convincing specific reasons, supported by

1  substantial evidence in the record, for rejecting the uncontroverted medical opinion of a

2  claimant's treating physician. Holohan v. Massanari, 246 F.3d 1195, 1203 (9th Cir. 2001). A

3  failure to set forth a reasoned rationale for disregarding a particular treating physician's findings is

4  legal error. Cotton v. Bowen, 799 F.2d at 1408.

5       The opinion of an examining physician is entitled to greater weight than the opinion of a

6  nonexamining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The uncontradicted

7  opinion of an examining physician may be rejected only if the Commissioner provides clear and

8  convincing reasons for rejecting it. Id.; Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir.

9  2001). An ALJ can reject the opinion of an examining physician and adopt the contradictory

10 opinion of a nonexamining physician only for specific and legitimate reasons that are supported

11 by substantial evidence in the record. Moore v. Commissioner of Social Security Administration,

12 278 F.3d 920, 925 (9th Cir. 2002) (quoting Lester v. Chater, 81 F.3d at 830-31).  An ALJ may

13 properly rely upon only selected portions of a medical opinion while rejecting other parts.

14 Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989).

15              C. Analysis

16      The ALJ did not explain the omission from the RFC of the other limitations that the

17 consulting examiner opined were due to Plaintiff's personality disorder, which included not only

18 mild to moderate limitations, but also moderate limitations of the ability to accept instructions

19 from a supervisor, respond appropriately to criticism, and interact with coworkers.

20      The ALJ put emphasis on the GAF score assessed by Dr. Hirokawa and his

21 characterization of mild symptoms. (A.R. 19.)  However, Dr. Hirokawa specifically noted that it

22 was Plaintiff's symptoms of depression and anxiety that were within the mild range.  In contrast,

23 the limitations that were due to a personality disorder (in abilities to accept instructions, respond

24 appropriately to criticism, and interact with coworkers) were assessed as moderate. (A.R. 233.)

25      The ALJ has the power to interpret medical evidence and resolve conflicts in it. Matthews

26 v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993). However, because of the specificity of Dr.

27 Hirokawa's functional assessments, this is not a situation in which the ALJ was interpreting the

28 evidence or resolving any internal inconsistency within Dr. Hirokawa's opinion. Instead, the ALJ

1   either misinterpreted the import of Dr. Hirokawa's limitations as being only mild, or failed to set

2   forth any  evaluation of the evidence and reasoned basis for his conclusion.  The ALJ thus did not

3   state any reasons for rejecting significant limitations in the opinion of Dr. Hirokawa.

4        Although it was the ALJ's prerogative to reject those limitations, he was also required to

5   explain his reasoning concerning his weighing of the opinion. An ALJ's opinion must contain

6   sufficient findings to permit intelligent judicial review.  Although the ALJ need not discuss all

7   evidence in the record, the ALJ may not reject significant probative evidence without explaining

8   why. Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984). Further, the RFC assessment

9   must include a narrative that shows the presence and degree of any specific limitations and

10  restrictions, as well as an explanation of how the evidence in the file was considered in the

11  assessment. Soc. Sec. R. 96-9p, p. 5. The ALJ must provide an accurate accounting of the

12  individual's abilities, limitations, and restrictions in order to determine the extent of erosion of the

13  occupational base at step five of the sequential analysis. Id.

14       Because the Court concludes in the analysis following, that the matter must be remanded,

15  at that time, the ALJ should reconsider Dr. Hirokawa's opinion and set forth sufficiently specific

16  and complete reasoning concerning this opinion.

17       VII. Sufficiency of the Evidence to Support the Physical RFC

18       Plaintiff argues that the opinion of consulting internist Dr. Adi Klein from February 2007

19  does not constitute substantial evidence to support the ALJ's conclusions concerning Plaintiff's

20  ability to walk and stand because it predated the prescription for a cane and the tearing of

21  Plaintiff's anterior cruciate ligament and meniscus, which remained unresolved at the time of the

22  hearing on May 13, 2008.

23       It is established that greater weight will be given to opinions based on or supported by

24  relevant evidence, such as medical signs and laboratory findings. 20 C.F.R. §§ 404.1527(d)(3),

25  416.927(d)(3). The agency will consider the extent to which an acceptable medical source is

26  familiar with the other information in the case record; an opinion should be based on the Plaintiff's

27  condition as a whole. 20 C.F.R. §§ 404.1527(d)(6), 416.927(d)(6). A more recent opinion may in

28  some circumstances be entitled to greater weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.

1  1993). The ALJ has a duty to consider all factors that might have a significant impact on an

2  individual's ability to work. Erickson v. Shalala, 9 F.3d 813, 817 (9th Cir.1993) (citing Varney v.

3  Secretary of HHS, 846 F.2d 581, 585 (9th Cir. 1987)).

4       Here, the opinions of the state agency medical consultants (A.R. 19) and of Dr. Klein

5  predated Plaintiff's knee injury and thus omitted crucial developments in Plaintiff's medical

6  history concerning her impairment of the right knee.

7       The argument that Plaintiff had not met her burden of proof to show disability of a

8  sufficient duration regarding her knee, is not tenable because the ALJ did not rely on an absence of

9  evidence of duration in making the findings.  Rather, the ALJ put weight on Dr. Klein's opinion,

10 issued in February 2007, that Plaintiff could lift and carry twenty pounds occasionally and ten

11 pounds frequently, and could stand and walk two hours in an eight-hour workday. (A.R. 19-20.)

12 This Court is limited to reviewing the findings of the ALJ and to reviewing the specific facts and

13 reasons that the ALJ asserts. Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). A district court

14 cannot make findings for the ALJ. Id. Likewise, a district court cannot affirm the judgment of an

15 agency based upon a ground the agency did not invoke in making its decision. Pinto v. Massanari,

16 249 F.3d 840, 847-48 (9th Cir. 2001).

17      The ALJ's reasoning was based also upon the characterization of Plaintiff's treatment as

18 conservative. (A.R. 18.) However, the Court notes that the uncontradicted evidence shows that

19 Plaintiff had consistently sought treatment but had suffered interruptions due to limitations related

20 to poor finances or insurance coverage.  Likewise, the evidence demonstrated that Plaintiff needed

21 surgery but could not obtain it because of a lack of appropriate insurance.  Notably, the ALJ did not

22 make a finding that rejected this evidence.  It appears that the conservative nature of Plaintiff's

23 treatment was due in substantial part to circumstances beyond Plaintiff's control and unrelated to

24 any absence of severity of symptoms. Thus, the ALJ's reasoning concerning conservative treatment

25 does not have legitimacy given the developing circumstances of the Plaintiff's condition.

26      Further, in view of the course and status of Plaintiff's condition and treatment, the present

27 record would not reasonably support an inference that Plaintiff's knee injury would resolve or

28 otherwise terminate at any specific time in the future. To the contrary, it appears that for the better

part of a year, Plaintiff's symptoms remained constant, and she remained unable to ambulate without an assistive device despite the passage of time.

It is not the function of this Court to re-weigh evidence upon review. However, in the present case, uncontradicted evidence established that a new, significant injury with substantial limitations occurred after the time the experts rendered the opinions that were relied upon by the ALJ, and because of that development and Plaintiff's documented need for an assistive device, the previous opinions were necessarily rendered incomplete and insubstantial.  Upon remand, the ALJ may consider the totality of the evidence, including any updated evidence concerning Plaintiff's impairments and their functional effects.

## VIII. The ALJ's Use of the Grids at Step Five

It is argued that because Plaintiff could not perform her past, relevant work and had multiple, non-exertional and exertional impairments consisting of mental limitations and the need to use a cane to ambulate, the testimony of a vocational expert (VE) was required at step five of the disability analysis to support the ALJ's finding that jobs that Plaintiff could perform existed in significant numbers in the national economy.

Plaintiff argues that the "grids," or the medical vocational guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2, speak only to exertional factors.  However, Plaintiff argues that because she was limited additionally to simple and repetitive tasks and limited contact with coworkers and, further considering her need to use a cane to ambulate, reliance on the grids was inappropriate.  As a result, Plaintiff asserts that the evidence was insufficient to sustain the determination that she could perform other work.

In finding that Plaintiff was not disabled, the ALJ used Medical-Vocational Rule 201.24 as a framework for decision. (A.R. 21.) The ALJ found that, although Plaintiff did not have the RFC to perform the full range of sedentary work, Plaintiff's additional limitations, which were not specifically referred to in the finding, had little or no effect on the occupational base of unskilled sedentary work.  Therefore, the ALJ determined that Plaintiff was not disabled pursuant to the framework of Rule 201.24.

The governing legal principles are established. Once a claimant proves that he cannot return

to her former work, the Commissioner must show that there are jobs in the national economy that the claimant can perform. Jones v. Heckler, 760 F.2d 993, 998 (9th Cir.1985). Defendant may meet this burden either by obtaining the opinion of a vocational expert or by relying on the grids, which constitute administrative notice of the existence of jobs for persons with specified limitations. Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999).   However, the grids may only be applied only when they accurately reflect a claimant's limitations. Desrosiers v. Secretary of Health & Human Services, 846 F.2d 573, 576-77 (9th Cir. 1988). If a nonexertional limitation significantly limits the range of work one can perform, mechanical application of the grids is inappropriate, and a VE is required. Tackett v. Apfel, 180 F.3d 1194, 1102 (9th Cir. 1999). Absent other reliable evidence of an applicant's ability to perform specific jobs, an ALJ must use a vocational expert. Perminter v. Heckler, 765 F.2d 870, 872 (9th Cir.1985).  Conversely, where nonexertional limitations are found not to limit significantly a claimant's exertional capacity, then use of the grids is appropriate. Razey v. Heckler, 785 F.2d 1426, 1430 (9th Cir. 1986), as amended, 794 F.2d 1348 (where substantial evidence supported the agency's conclusion that the claimant's generalized anxiety disorder did not prevent him from engaging in the work that he was physically able to do, use of the grids was appropriate); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir.1983) (where substantial evidence supported the finding that the claimant's non-exertional impairments of deafness, dizziness, and drug dependence did not significantly limit his exertional capacities, use of the grids was appropriate, and no finding as to specific jobs was required).

Here, the record is inconsistent with respect to the date on which the cane was prescribed. Although Plaintiff testified that she thought it was in the middle of March 2008 when Dr. Sadiq prescribed a cane (A.R. 59), the medical records reflect that it was earlier, on November 29, 2007, about two months after Plaintiff's fall, that Drs. Sadiq and Abejie advised Plaintiff to use a cane to avoid weight-bearing (A.R. 365-66). It appears that Plaintiff was either mistaken as to the precise time of the advent of the prescription, or was referring to a later repetition of the advice. The remainder of her testimony reflected constant use of the cane as prescribed based on the necessity of avoiding another fall. (A.R. 57-58, 59-60.)

This inconsistency does not undermine the clear evidence that in November 2007, a treating

source advised Plaintiff to use a cane for the purpose of avoiding weight-bearing. The proscription against weight-bearing appears to have been intended to sweep broadly to prevent all weight-bearing It was not limited to any specific terrain or set of circumstances. The record permits no inference other than that as of late November 2007, as described in Social Security Ruling 96-9p (p. 6), Plaintiff's need for the cane was medically documented. Further, at the time of the hearing in May 2008, Plaintiff had not received the anticipated surgical care and the medical evidence reflected constant symptoms (continued slight swelling and tenderness to palpation at the site). In short, there was no other medical development that warranted an inference that Plaintiff's knee condition had improved since the time she was advised to use the cane.

The ALJ's decision does not contain any express finding concerning Plaintiff's need to use the cane. The ALJ's credibility findings concerned the extent of Plaintiff's claimed disability but they did not focus upon the Plaintiff's use of a medically necessary cane. The ALJ noted that Plaintiff had reported to Dr. Adi Klein in February 2007 that she did not use a cane. (A.R. 19.) However, this was not inconsistent with Plaintiff's use of a cane after the fall in September 2007.

On the other hand, to perform the full range of work administratively noticed by a rule, a person must be able to perform substantially all of the strength demands defining the sedentary level of exertion, as well as the physical and mental non-exertional demands required for the performance of substantially all of the unskilled work considered at the sedentary level. (Soc. Sec. R. 96-9p, p. 1.) The ability to perform the full range of sedentary work requires the ability to 1) lift no more than ten pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools; and 2) walk and stand occasionally, meaning from very little up to one-third of the time, and generally no more than about two hours of an eight-hour day. Id. p. 3.

However, unskilled sedentary work also involves other, non-exertional activities, such as capacities for manipulation. Id. For example, a loss of bilateral manual dexterity would be significant. Soc. Sec. R. 83-14, p. 4. Most unskilled sedentary jobs require good use of both hands and fingers, i.e., bilateral manual dexterity; any significant manipulative limitation of a persons' ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled occupational base; in cases involving less significant limitations, it may be useful to

1    consult a vocational resource. Soc. Sec. Ruling 96-9p p. 7.

2       With respect to use of a medically required hand-held assistive device, Plaintiff's use of a

3    cane was an exertional impairment[8] which required evaluation by the ALJ with reference to the

4    particular facts of Plaintiff's case. Soc. Sec. R. 96-9p p. 6. A limited need for a cane, such as only

5    for prolonged ambulation or for use on certain terrain, would not ordinarily significantly erode the

6    occupational base of unskilled sedentary work.  Further, if the person is limited to sedentary work

7    because of an impairment that affects only one lower extremity, such as an unstable knee, and she

8    has no other functional limitations or restrictions, then the person may still have the ability to make

9    an adjustment to sedentary work that exists in significant numbers. (Id.) However, the occupational

10    base for one who must use the device for balance because of significant involvement of both lower

11    extremities (such as because of a neurological impairment) may be significantly eroded. Id. With

12    respect to hand-held assistive devices, the ruling concludes:

13       In these situations, too, it may be especially useful to consult a vocational resource
        in order to make a judgment regarding the individual's ability to make an
14      adjustment to other work.

15    Id. at 6.

16       Here, Plaintiff's need to use the cane was unlimited and universal. The diagnoses

17    concerning her leg were complex (a torn anterior cruciate ligament, a tear on the medial meniscus,

18    joint effusion, and a Baker cyst). It does not appear that the ALJ considered the postural

19    limitations, if any, that might or would necessarily result from Plaintiff's use of a cane. These

20    factors could be significant.  For example, if a person is limited in balancing even when standing or

21    walking on level terrain, it could significantly erode the unskilled, sedentary occupational base.

22    Soc. Sec. Ruling 96-9p p. 7. Ability to stoop occasionally is required in most unskilled sedentary

23    occupations. Id.

24       Here, the limitations resulting from Plaintiff's knee impairment or impairments were not

25    Plaintiff's only functional limitations. The ALJ limited Plaintiff to simple, repetitive tasks.

26

27        [8] See, Soc. Sec. Ruling 96-9p p. 6, categorizing use of the device as an exertional impairment. The Court
notes that use of a cane has been considered a non-exertional impairment as well. See, Walker v. Bowen, 826 F.2d
28   996, 1003 (11th Cir. 1987).

1  Although this in itself may be generally sufficient to enable one to engage in basic, work-related

2  activities,[9] its cumulative effect in light of Plaintiff's other limitations, was not assessed. Further,

3  the ALJ restricted Plaintiff to "limited contact with coworkers." (A.R. 17.) With respect to

4  unskilled work, the basic mental demands of competitive, remunerative, unskilled work include the

5  abilities on a sustained basis to respond appropriately to supervision, coworkers, and usual work

6  situations. Soc. Sec. Ruling 85-15 p. 4. A substantial loss of ability to meet any of these basic

7  work-related activities would severely limit the potential occupational base. Id.  Likewise, a less

8  than substantial loss of ability to respond appropriately to supervision and co-workers may or may

9  not significantly erode the unskilled sedentary occupational base; the person's remaining capacities

10  must be assessed and a judgment made as to their effects on the unskilled occupational base

11  considering the other vocational factors. When a person has been found to have a limited ability in

12  one or more of these basic work activities, it may be useful to consult a vocational resource. Id., p.

13  8. In more complex cases, the ruling directs that the adjudicator may consult a VE to analyze the

14  impact of the RFC on the full range of sedentary work (which the adjudicator may consider in

15  determining the extent of the erosion of the occupational base), examples of occupations the

16  individual may be able to perform, and information concerning the existence and number of jobs in

17  such occupations in the national economy. Id.

18      Here, Plaintiff had a combination of impairments and limitations that may have

19  significantly eroded the occupational base.  The record lacks evidence to support the ALJ's

20  generalized conclusion that Plaintiff's multiple limitations had little or no effect on the

21  occupational base of unskilled work. Plaintiff's multiple impairments thus rendered reliance on the

22  grids inappropriate. Therefore, A vocational expert should have been consulted. See, Shumaker v.

23  Astrue, 657 F.Supp.2d 1178, 1184-85 (D.Mont. 2009).

24      With respect to the errors at step five, the appropriate remedy is to remand to take the

25  testimony of a vocational expert and for a hearing to identify the specific work, if any, the Plaintiff

26

27          [9] With respect to unskilled work, the basic mental demands of competitive, remunerative, unskilled work
    include the ability on a sustained basis to understand, carry out, and remember simple instructions.  Soc. Sec. Ruling
28  85-15 p. 4.

25

could perform. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1104 (9th Cir. 1999). In the present case, upon remand, with respect to Plaintiff's RFC, the ALJ will have an opportunity to consider and state reasoning concerning all the significantly probative evidence concerning limitations and, as appropriate, to obtain vocational testimony.

IX. <u>Disposition</u>

A district court is authorized to affirm, modify, or reverse a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). The decision whether to remand a matter pursuant to sentence four of § 405(g) or to order immediate payment of benefits is within the discretion of the district court. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. <u>Moisa v. Barnhart</u>, 367 F.3d 882, 886 (9th Cir. 2004) (citing <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002)). It is not necessary to order an award of benefits, <u>Connett v. Barnhart</u>, 340 F.3d 871, 876 (9th Cir. 2003).  Generally, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed, <u>Varney v. Secretary of Health and Human Services</u>, 859 F.2d 1396, 1399 (9th Cir. 1988).

Because additional issues remain to be addressed upon remand, and further because it is not clear that an award of benefits to Plaintiff should result after the additional issues are addressed, the Court will order the matter remanded for further development and consideration of the evidence and entering of all necessary and appropriate findings with respect to the applications for DIB and SSI pending before the Court.

Accordingly, it IS ORDERED that

1.     Plaintiff's social security complaint IS GRANTED, and

2.     The matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration, consistent with this decision, of Plaintiff's status as disabled, including Plaintiff's residual functional capacity, and, if appropriate, whether or not Plaintiff could perform her past work and whether or not on the basis of the Plaintiff's age, education, work experience, and residual functional capacity, she

could perform any other gainful and substantial work within the economy, as well as preparation of a decision containing all required findings; and

3. Judgment BE ENTERED for Plaintiff Joeann Coleman and against Defendant Michael J. Astrue.

IT IS SO ORDERED.

Dated:   **March 22, 2010**                                            **/s/ Jennifer L. Thurston**
                                                                        UNITED STATES MAGISTRATE JUDGE